# EXHIBIT A

**WEITZ & LUXENBERG, P.C.**
BY:  NANCY M. CHRISTENSEN
        IDENTIFICATION NO.: 325564
        700 BROADWAY
        NEW YORK, NY  10003
        (212) 485-1897
        nchristensen@weitzlux.com



Filed and Attested by the
Office of Judicial Records
ATTO... ...S SMITH
PLAINTIF... ...

---

| | |
|---|---|
| **RODNEY HARTMAN**<br>601 Manor Drive<br>Horsham, PA 19044<br><br>*Plaintiff*<br><br>        vs.<br><br>**ARKEMA INC.**<br>900 First Avenue<br>King of Prussia, PA 19406<br><br>**3M COMPANY**<br>**(f/k/a Minnesota Mining and**<br>**Manufacturing Co.)**<br>3M Center<br>St. Paul, Minnesota 55133<br><br>**TYCO FIRE PRODUCTS L.P.**<br>One Stanton Street<br>Marinette, Wisconsin 54143<br><br>**CHEMGUARD, INC.**<br>One Stanton Street<br>Marinette, Wisconsin 54143<br><br>**BUCKEYE FIRE EQUIPMENT COMPANY**<br>110 Kings Road<br>Kings Mountain, North Carolina 28086<br><br>**NATIONAL FOAM, INC.**<br>141 Junny Road<br>Angier, North Carolina 27501 | **PHILADELPHIA COUNTY**<br>**COURT OF COMMON PLEAS**<br>**TRIAL DIVISION**<br><br>**FEBRUARY TERM, 2025**<br><br>**No.**<br><br>**JURY OF 12 DEMANDED** |

1

Case ID: 250200612

**DYNAX CORPORATION**
103 Fairview Park Drive
Elmsford, New York 10523

**E.I. DU PONT DE NEMOURS AND COMPANY**
974 Centre Road
Wilmington, Delaware 19805

**THE CHEMOURS COMPANY**
1007 Market Street
Wilmington, Delaware 19899

**THE CHEMOURS COMPANY FC, LLC**
1007 Market Street
Wilmington, Delaware 19899

**CORTEVA, INC.**
974 Centre Road
Wilmington, Delaware 19805

**DUPONT DE NEMOURS, INC.**
974 Centre Road
Wilmington, Delaware 19805

**CARRIER GLOBAL CORPORATION,**
*individually and as successor in interest to Kidde-Fenwal, Inc.,*
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418

**CHEMDESIGN PRODUCTS INC.**
2 Stanton Street
Marinette, Wisconsin 54143

**CLARIANT CORPORATION,** *individually and as successor in interest to Sandoz Chemical Corporation,*
4000 Monroe Road
Charlotte, North Carolina 28205

Case ID: 250200612

**BASF CORPORATION,** *individually and as*
*successor in interest to Ciba Inc.,*
100 Park Avenue
Florham Park, New Jersey 07932,

*Defendants*

## <u>COMPLAINT – CIVIL ACTION</u>

Case ID: 250200612

**NOTICE TO DEFEND**

| "NOTICE | "AVISO |
|---|---|
| "You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by  entering a written appearance personally or by an attorney and filing in writing with the court your  defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may  proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | "Le han demandado en corte.  Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) dias, a partir de recibir esta demanda y la notificación para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted.  Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante.  Usted puede perder dinero o propiedad u otros derechos importantes para usted. |
| "YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU  DO NOT HAVE A LAWYER OR CANNEOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE.  SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME  POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL.  ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO. |
| THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.  IF YOU CANNEOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO. |
| PHILADELPHIA BAR ASSOCIATION     LAWYER REFERRAL and INFORMATION SERVICE     One Reading Center     Philadelphia, Pennsylvania 19107     (215) 238-1701" | ASSOCIACION DE LICENDIADOS DE FILADELFIA     SERVICO DE REFERENCIA E INFORMACION LEGAL     One Reading Center     Filadelfia, Pennsylvania 19107     Telefono: (215) 238-1701" |

4

Case ID: 250200612

## COMPLAINT – CIVIL ACTION

Plaintiff Rodney Hartman, by and through his attorneys, as and for his complaint against Defendants, Arkema Inc., 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Tyco Fire Products L.P., Chemguard, Inc., Buckeye Fire Equipment Company, National Foam, Inc., Dynax Corporation, E.I. du Pont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc., Carrier Global Corporation, ChemDesign Products, Inc., Clariant Corporation, BASF Corporation, (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this action against Defendants for personal injury because his drinking water has been contaminated by per- and poly-fluroalkyl substances ("PFAS"), and/or their chemical precursors related to the use of Aqueous Film Forming Foam ("AFFF"), a fire-fighting foam containing PFAS compounds, and he has developed testicular cancer as a result of the contamination of his drinking water.

2.      Defendants designed, manufactured and distributed AFFF containing PFAS and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") contained in AFFF (collectively, "AFFF/Component Products") that contaminated and continues to contaminate the environment and cause injury, yet no Defendant included user warnings to protect the environment or innocent bystanders.

3.      For decades, the Defendants manufactured and sold AFFF/Component Products that were used by the U.S. Navy and the Pennsylvania Air National Guard for use on ships and at military bases, including the former Willow Grove Naval Air Station Joint Reserve Base in

5

Case ID: 250200612

Horsham Township, Pennsylvania (the "Willow Grove Base"), and the former Naval Air Warfare Center in Warminster Township Pennsylvania (the "Warminster Base"). (The Willow Grove Base and the Warminster Base are collectively referred to as the "Bases.")

4.    The Defendants' AFFF/Component Products are believed to include perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants or "PFAS"). PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS and PFOA and/or their chemical precursors, are or were components of AFFF products. The Defendants' precise compositions and formulas for their AFFF/Component Products during the relevant period have not been made public.

5.    When consumed, PFOS and PFOA have been linked to numerous and serious health issues. PFOA and PFOS are associated with a variety of illnesses, including but not limited to, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia. The chemicals are particularly dangerous for pregnant women and young children.

6.    Residents in the area near the Bases, including Plaintiff, obtained and continue to obtain their drinking water predominantly from groundwater pumped from either municipal or private wells.

7.    For decades, residents near the Bases and their children have been drinking, and eating food prepared with, water laced with dangerous chemicals, namely, perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

6

Case ID: 250200612

8.    As the manufacturers of AFFF/Component Products, the Defendants knew or should have known that the inclusion of Toxic Surfactants and/or their chemical precursors in AFFF presented an unreasonable risk to human health and the environment.

9.    Nonetheless, Defendants marketed and sold their products with the full knowledge that large quantities of Toxic Surfactant-laden AFFF/component products would be used in training exercises and in emergency situations in such a manner that the dangerous chemicals would be introduced, in large quantities, into the environment.

10.    For years, Plaintiff has been exposed to and has ingested PFOS and PFOA at extremely high and dangerous levels.

11.    Plaintiff had no way to know that he was consuming water and food contaminated with PFOS and PFOA, caused by the use of AFFF/Component products, until the contamination was disclosed to him by state and federal officials

## PARTIES

### Plaintiff

12.    Plaintiff Rodney Hartman is a citizen of the Commonwealth of Pennsylvania, who, from approximately 1967 through 1989, resided at various addresses in Warminster, PA, and obtained his drinking water from Warminster Township.

13.    Plaintiff's water supply in Warminster was contaminated with PFOS and PFOA.

14.    As a result of his exposure to drinking water contaminated with PFOS and PFOA, Plaintiff Rodney Hartman developed and was diagnosed with testicular cancer.

15.    As a direct and proximate result of his exposure to drinking water contaminated with PFOS and PFOA, Plaintiff Rodney Hartman was forced to undergo surgical procedures and treatment, and as a further result of his exposure to contaminated drinking water, Plaintiff has

7

experienced pain and suffering and a diminished quality of life, emotional distress, and economic loss.

**Defendants**

16.     Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.  Arkema does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

17.     Arkema develops specialty chemicals and fluoropolymers. Arkema and/or its predecessors manufactured fluorochemical products used in AFFF.

18.     Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc., which also manufactured fluorochemical products.

19.     At all times relevant hereto, Defendant Arkema purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

20.     Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases and other locations throughout the country.

Case ID: 250200612

21.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF-containing PFCs, that included but was not limited to PFOA and PFOS.

22.     3M designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

23.     At all times relevant hereto, Defendant 3M purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

24.     Defendant Tyco Fire Products, LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin.  Tyco does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

25.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul").

26.     At all times relevant, Tyco/Ansul manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF, that contained fluorocarbon surfactants containing PFCs.

27.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFCs, that included but was not limited to PFOA and PFOS.  After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFCs, that included but was not limited to PFOA and PFOS.

9

Case ID: 250200612

28.     Tyco/Ansul designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

29.     At all times relevant hereto, Defendant Tyco/Ansul purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

30.     Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.  Chemguard does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.  At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

31.     Chemguard designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

32.     At all times relevant hereto, Defendant Chemguard purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

33.     Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.  Buckeye does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.  At all

10

times relevant, Buckeye Fire manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

34.     Buckeye designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

35.     At all times relevant hereto, Defendant Buckeye purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

36.     Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.  National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products.  National Foam does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.  References to "National Foam" herein shall also refer to AFFF commercially manufactured, marketed and sold under the "Angus" name and "Angus Fire" brand.

37.     At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF, that contained fluorocarbon surfactants containing PFCs.

38.     National Foam designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

39.     At all times relevant hereto, Defendant National Foam purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial,

11

continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

40.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in Pennsylvania. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

41.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

42.     Dynax designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

43.     At all times relevant hereto, Defendant Dynax purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

44.     Defendant E.I. du Pont De Nemours & Co. is a Delaware Corporation and does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

45.     E.I. du Pont De Nemours & Co. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

46.     At all times relevant hereto, Defendant E.I. du Pont De Nemours & Co. purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and

Case ID: 250200612

regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

47.     Defendant The Chemours Company is a Delaware Corporation and conducts business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.  Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

48.     The Chemours Company designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

49.     The Chemours Company was incorporated as a subsidiary of E.I. du Pont De Nemours & Co. as of April 30, 2015.  From that time until July 2015, The Chemours Company was a wholly-owned subsidiary of E.I. du Pont De Nemours & Co.  In July 2015, E.I. Du Pont de Nemours & Co. spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to E.I. du Pont De Nemours & Co. stockholders, and The Chemours Company has since been an independent, publicly traded company.

50.     At all times relevant hereto, the Chemours Company purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

51.     Defendant The Chemours Company FC, LLC is a Delaware Corporation and conducts business throughout the United States including conducting business in Pennsylvania and Philadelphia County.  Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

Case ID: 250200612

52.     The Chemours Company FC, LLC designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

53.     At all times relevant hereto, The Chemours Company FC, LLC purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

54.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

55.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. ("DowDuPont").  E.I. du Pont De Nemours & Co. and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

56.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware.  Corteva does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

57.     Corteva designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

58.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

14

Case ID: 250200612

59.    Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

60.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

61.    At all times relevant hereto, Corteva purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

62.    Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

63.    DuPont de Nemours, Inc. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

64.    At all times relevant hereto, DuPont de Nemours, Inc. purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

65.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to

15

be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

66.     Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, L.L.C; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

67.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

68.     Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

69.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal Inc. as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

70.     At all times relevant hereto, Carrier purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

71.     Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street,

Case ID: 250200612

Marinette, WI, 54143. ChemDesign does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

72.    On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

73.    At all times relevant hereto, ChemDesign purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

74.    Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.  Clariant does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

75.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

76.    On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

77.    At all times relevant hereto, Clariant purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

17

Case ID: 250200612

78.     Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.  On information and belief, on or about 2008, BASF acquired Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) is the successor-in-interest to Ciba, Inc. BASF does business throughout the United States, including conducting business in Pennsylvania and Philadelphia County.

79.     On information and belief, BASF has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

80.     At all times relevant hereto, BASF purposefully established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous and systematic business activities in Pennsylvania and regularly conducts business in Philadelphia County (subjecting it to the general jurisdiction of this Court).

81.     Arkema Inc., 3M Company, Tyco Fire Products L.P; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; Dynax, Inc.; E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc., Carrier Global Corporation, ChemDesign Products, Inc.; Clariant Corporation; and BASF Corporation are collectively referred to as "Defendant" or "Defendants."  The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

82.     Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS-containing AFFF and/or PFAS for use in AFFF and/or chemical precursors to PFOA/PFOS that was delivered into areas affecting Plaintiff's water supply, such that AFFF/Component Products containing

18

Case ID: 250200612

PFOA and PFOS have contaminated Plaintiff's water supply; (b) acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS for use in AFFF and/or chemical precursors to PFOA/PFOS would be delivered into areas affecting Plaintiff's water supply; (c) are legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Complaint; and (d) promoted PFAS-containing AFFF and/or PFAS for use in AFFF and/or chemical precursors to PFOA/PFOS, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

83.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

84.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

85.    Venue is proper in this Court pursuant to Pa. R.C.P. No. 1006(c) because Plaintiff alleges joint and several liability against all Defendants and some or all of them regularly conduct business in Philadelphia County.

86.    This case and the claims herein involve certain federal regulations, rules and procedures for the purchase, use, training, and disposal of AFFF at federal military bases at issue in this case and separately, federal questions related to government contractor defenses.

87.    This action is being filed as a protective action.

Case ID: 250200612

## GENERAL FACTUAL ALLEGATIONS

### A.    PFOA and PFOS, Their Chemical Characteristics, and Risk in Groundwater

88.    Poly- and perfluroalkyl substances (collectively "PFAS compounds") are terms used to describe a group of organic flurorinated alkanes. PFAS compounds have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

89.    There are six long-chain PFAS compounds, which are divided into two sub-categories: (1) long-chain perfluoraoalkyl carboxylic acids (PFCAs) like PFOA, and (2) perfluoroalkane sulfonates (PFSAs), including perfluorohexane sulfonate (PFHxS) and PFOS. PFOS and PFOA compounds are the most toxic manmade chemicals of the PFAS family.

90.    PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond that is one of the strongest chemical bonds that occurs. PFOS and PFOAs are extremely persistent in the environment and in the human body, and have the potential to bioaccumulate and biomagnify in wildlife. Bioaccumulation appears to be related to the length of the C-F chain; as the size of the chain increases, the compound becomes more bioaccumulative.

91.    PFOS and PFOA have unique characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFOS and/or PFOA are applied, discharged, disposed of, or otherwise released onto land, those compounds migrate through the subsurface and into groundwater, resist natural degradation, and are difficult and costly to remove from water.

20

Case ID: 250200612

92.     PFOA and PFOS contamination presents a significant threat to public health and welfare. PFOA is readily absorbed in the body after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver. Studies have shown that exposure to fluorochemicals that contain eight carbons or more ("C8"), such as PFOS and PFOA, may cause testicular cancer, kidney cancer, and liver damage in adults, as well as developmental effects to fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty, and skeletal variations.

93.     There have also been studies linking C8s with autoimmune and endocrine disorders, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease, and pregnancy-induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOS or PFOA.

94.     Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFOS and PFOA in humans.[1]

**B.     Defendants' History of Production of PFOA/PFOS and Commercialization of AFFF**

95.     3M began producing PFOA as part of a process called electrochemical fluorination (ECF) in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS.

96.     For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been 3M, through its supply of AFFF.

---

[1] U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf

Case ID: 250200612

97.     In the 1960s, 3M began developing Class B AFFF to be used at airports and military bases for firefighting and explosion drills. AFFF was created to extinguish Class B fires, which are fueled by flammable liquid, and particularly difficult to fight using traditional methods of extinguishing fires. Class B fires cannot be safely extinguished with water.

98.     AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

99.     Beginning in the 1960s, the Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products, fluorosurfactants containing either PFOS or PFOA for use in AFFF products, or the chemical precursors that degrade into PFOS and PFOA.

100.     3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

101.     Arkema manufactured and sold the Forafac line of fluorochemical surfactants that were used in AFFF products in the 1990s and 2000s, and possibly earlier.

102.     AFFF containing Arkema's fluorochemical surfactants was used at the Bases and ultimately led to the contamination of Plaintiff's drinking water supply with PFOA and PFOS.

103.     After its creation in the 1960s and entrance into the commercial market, AFFF was utilized by the Department of Defense and the US Navy to extinguish fuel-based fires during routine military drills. AFFF was also used in hundreds of bases across the country.

104.     In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

Case ID: 250200612

105.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

106.    On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

107.    In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

108.    After 3M exited the AFFF market, the remaining Defendant continued to manufacture and sell AFFF/Component Products.

109.    The Defendants knew their customers warehoused large stockpiles of AFFF/Component Products and touted the shelf-life of AFFF.

110.    While the Defendants phased out production or transitioned to new formulas of AFFF/Component Products, they did not instruct users of AFFF/Component Products that they should not use AFFF/Component Products that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

111.    The Defendants further did not act to remove AFFF/Component Products from the stream of commerce.

112.    The Defendants did not warn public entities or others that AFFF/Component Products would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of public water drinking wells.

23

Case ID: 250200612

113.    Accordingly, for many years after the original sale of AFFF/Component Products, these AFFF/Component products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils and waters, contamination public drinking water wells and endangering human health.

114.    The Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

115.    The PFCs the Defendants needed to manufacture fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors and were designed, manufactured, marketed, distributed and/or sold by the Defendants.

116.    On information and belief, the Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in AFFF/Component Products.

117.    On information and belief, the Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products that were stored, handled, used, or otherwise discharged, resulting in widespread PFAS contamination.

118.    On information and belief, the Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products stored, handled, used, or otherwise discharged, resulting in widespread PFAS contamination.

1.    **3M's Knowledge of the Dangers of PFAS**

119.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

24

120.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

121.    By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

122.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment.

123.    An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

124.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

125.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

126.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

127.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

128.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

129.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

Case ID: 250200612

130.     Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

131.     This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

132.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

133.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment.

134.     3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

135.     3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

136.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

137.     In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

138.     3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

139.     In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

Case ID: 250200612

140.    In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

141.    On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

142.    3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and contaminate Plaintiff's drinking water.

143.    Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS.

### 2.    DuPont's Knowledge of the Dangers of PFAS

144.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

145.    DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

146.    In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

Case ID: 250200612

147.     This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

148.     By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

149.     DuPont did not report this data or the results of its worker health analysis to any government agency or community.

150.     The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

151.     Not only did DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

152.     In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

153.     While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

154.     Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

155.     DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

156.     After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

Case ID: 250200612

157.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

158.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

159.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

160.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

161.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

162.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

163.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

164.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in Pennsylvania near Plaintiff's residence.

**3.    Other Defendants' Knowledge of the Dangers of PFAS**

Case ID: 250200612

165.    Arkema, Tyco/Ansul, Chemguard, Buckeye, Dynax, National Foam/Angus Fire, Clariant, ChemDesign, Carrier Global, and BASF knew, or at the very least should have known, that in their intended and/or common use, their AFFF/Component Products would harm the environment and human health, including causing harm to Plaintiff.

166.    Arkema, Tyco/Ansul, Chemguard, Buckeye, Dynax, National Foam/Angus Fire, Clariant, ChemDesign, Carrier Global, and BASF knew, or at the very least should have known that, their AFFF/Component Products would contaminate Plaintiff's water supply and cause him to suffer injuries.

167.    Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF/Component Products manufacturing, and each has detailed information and understanding about the chemical compounds that form AFFF/Component products containing PFOS, PFOA, or their chemical precursors.

168.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

169.    DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

170.    Almost all of the Defendants that manufactured AFFF were members of the FFFC ("FFFC Defendants").

171.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

172.    The FFFC Defendants worked together to protect AFFF from scrutiny.

173.    Their close cooperation included messaging on PFOA's toxicological profile.

30

174.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

175.    FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

176.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

177.    FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market.  Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

178.    FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

179.    While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and Plaintiff.

### 4.    DuPont's Spinoff of Chemours

180.    In February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary.

181.    In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

182.    At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

Case ID: 250200612

183.    Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

184.    Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds.  At the time, it was the largest such penalty in history.

185.    DuPont also promised to phase out production and use of PFOA by 2015.

186.    Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

187.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

188.    After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

189.    Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight member board of directors of the new public company.

190.    The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

191.    In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

Case ID: 250200612

192. Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

193. Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business' liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

194. Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

195. Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

196. Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

197. In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

33

Case ID: 250200612

198.    The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

199.    The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

200.    As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

201.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

202.    Plaintiff's water supply has been, and continue to be, contaminated in varying amounts over time, as a result of Defendants' AFFF containing PFAS and/or PFAS surfactants for use in AFFF, causing Plaintiff significant injury and damage.

**C.    AFFF Use at the Willow Grove and Warminster Bases**

203.    At any given time during their operation, the Bases housed and used thousands of gallons of AFFF concentrate manufactured by Defendants, stored in buckets, drums, tanks, tankers, crash trucks and sprinkler systems.

204.    U.S. Navy, Air National Guard, Marines, and Air Force (collectively referred to as "Military") personnel, as well as civilian firefighters, conducted training exercises at the Willow Grove and Warminster Bases.

205.    In part, the Military and civilian firefighters engaged in firefighting, explosion training, and sprinkler system testing that required the use of AFFF.

Case ID: 250200612

206.    For decades, firefighting training activities took place at the two military bases.

207.    Each site also possessed and maintained aircraft hangars protected by ceiling units holding hundreds of gallons of AFFF.

208.    The use of AFFF/Component Products for training purposes included suppressing fires and explosions on the ground, clearing hoses, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

209.    Instructions and warning labels affixed to AFFF/Component Products by the Defendants did not adequately describe the scope of danger associated with storage, use, clean up, and disposal of AFFF/Component Products, or the procedures necessary for the safe storage, use, clean up, and disposal of AFFF/Component Products.

210.    Defendants were aware of the health risks associated with use, disposal and bioaccumulation of AFFF/Component Products, but, upon information and belief, did not warn the users of the AFFF/Component Products.

211.    Defendants were aware of the health risks of introducing AFFF/Component Products into the environment, but, upon information and belief, did not warn the users of the AFFF/Component Products.

212.    Upon information and belief, at no time during the relevant period did the Defendants warn users of the AFFF/Component Products that ingredients in the AFFF/Component Products were persistent, bioaccumulative, and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground and surface water and migrate off the Bases, contaminating the drinking water of the surrounding communities, and exposing tens of thousands of innocent people, including Plaintiff, to water contaminated by their products.

35

Case ID: 250200612

C.    **Plaintiff's Discovery of Toxic Chemicals in His Drinking Water**

213.    Prior to 2012, municipal water providers were not required to test their drinking water for the presence of PFOS or PFOA, and tests for PFOS and PFOA were rare.

214.    In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), which thereby required certain water providers across the country, including the towns surrounding the Bases, to test their water for the presence of PFOS and PFOA.

215.    Beginning in and around 2014, the water providers in the vicinity of the Bases began testing wells in accordance with UCMR3.

216.    In 2014, the Horsham Water and Sewer Authority tested its municipal wells in accordance with UCMR3.  The testing showed that two of its wells were contaminated with PFOS above the provisional health advisory level of 200 ppt.

217.    Between November 2013 and June 2014, the Warminster Municipal Authority also tested its wells in compliance with UCMR3.  The testing showed PFOS levels of 40 ppt to 1090 ppt and PFOA levels of 20 ppt to 890 ppt.

218.    Warrington Township also participated in UCMR3 during 2014 and 2015.  Its testing showed PFOS levels as high as 1600 ppt and PFOA levels up to 270 ppt.

219.    The discovery of contaminated municipal drinking water wells at levels above the preliminary health advisory led the EPA to begin testing private wells in the vicinity of the Bases.

220.    In May 2016, the EPA replaced its preliminary health advisory with a Lifetime Health Advisory of 70 ppt for PFOS and 70 ppt of PFOA.  In addition, where both PFOS and PFOA are present, the combined Health Advisory limit is also 70 ppt.

221.    The Horsham, Warminster and Warrington water authorities had stopped using wells that tested above the EPA's preliminary health advisory of levels of 200 ppt for PFOS and

36

Case ID: 250200612

400 ppt of PFOA—but after EPA issued Lifetime Health Advisory of 70 ppt for PFOS and 70 ppt of PFOA and combined limit of 70 ppt, the water authorities had to reassess the scope of the problem.

222.    After EPA's issuance of the May 2016 Lifetime Health Advisory, the Horsham, Warminster and Warrington water authorities took even more wells out of service, and even more private well owners were advised that their drinking water was now considered unsafe.

223.    As a result of the EPA issuing its final Lifetime Health Advisories for PFOS and PFOA, current and former residents, including Plaintiff, began to learn that their water was and had been contaminated with dangerous levels of PFOS and PFOA.

224.    Plaintiff obtained his drinking water from the municipal water provider for Warminster.

225.    Subsequently, Plaintiff learned that his drinking water was contaminated with dangerous levels of PFOS and/or PFOA.

226.    Plaintiff subsequently learned of the adverse health impact associated with exposure to PFOA and/or PFOA, including, specifically, the link between exposure and testicular cancer.

227.    Plaintiff has since learned that the source of the contamination is the use of AFFF/Component Products at the Bases; that the Defendants were manufacturers of AFFF/Component Products used at the bases; and that exposure to Defendants' chemicals caused his injuries.

228.    As set forth herein, Defendants knowingly manufactured, sold, and distributed dangerous and defective AFFF/Component Products, failed to provide proper warnings to protect

Case ID: 250200612

bystanders, such as the Plaintiff, and failed to recall their products when they took them off the market.

229.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their affirmative misrepresentations and omissions, Defendants actively concealed the identity of their products and/or true risks associated with use of and exposure to their products.

230.    As a result of Defendants' actions and inactions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

231.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding their involvement with selling AFFF/Component products that led to the contamination of Plaintiff's water and/or the safety of AFFF/Component Products. Defendants were under a duty to disclose the true character, quality and nature of AFFF/Component Products, including that they may cause adverse health impacts, contaminate public water supplies, particularly in the vicinity of military bases where it is heavily used, and accumulate in the body and environment over time, because this was non-public information over which they had exclusive control.  Defendants knew this information was not available to Plaintiff, his medical providers and/or his health facilities, yet they failed to disclose this information to the public.

**D.    AFFF-Containing PFOA and PFOS Is Fungible and Commingled in the Groundwater**

Case ID: 250200612

232.    AFFF containing PFCs, including PFOA and/or PFOS and/or their chemical precursors, once it has been released to the environment and groundwater, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

233.    The process of manufacture and distribution of AFFF, including that which contains PFOA and/or PFOS and/or their chemical precursors, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

234.    The process of manufacture and distribution of AFFF, including that which contains PFOA and/or PFOS and/or their chemical precursors, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

235.    There were most likely several areas located around the Bases where firefighting exercises were historically conducted and where AFFF was used and entered the groundwater and it is not possible to determine the identity of the manufacturer whose AFFF/Component Products contributed to the groundwater contamination plume impacting Plaintiff's water supplies.

236.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was the source of PFOA and PFOS found in Plaintiff's water supply is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have caused Plaintiff to suffer.

237.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOA and PFOS, to profit from the use of AFFF/Component Products, at

39

Case ID: 250200612

Plaintiff's expense, to foreseeably contaminate Plaintiff's water supplies, and to attempt to avoid liability for such contamination of the groundwater.

238.    Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for AFFF/Component Products at issue in this Complaint.    Each of these Defendants participated in a state-wide and national market for AFFF/Component Products during the relevant time.

239.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products.

240.    Enterprise liability attaches to all of the named Defendants for placing defective products into the stream of commerce.

241.    Defendants were under a continuous duty to consumer, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to AFFF/Component Products.

242.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning AFFF/Component Products and the serious risks associated with the use of and exposure to AFFF/Component Products.

Case ID: 250200612

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

243.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

244.    Plaintiff had no way of knowing about the risks of serious illness associated with the use of Defendants' AFFF/Component Products until he was made aware that his illness could be caused by the use of Defendants' products at the nearby Bases.  Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that his illness was linked to the use of Defendants' products at the nearby Bases.

245.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that he was exposed to PFAS and that PFAS is injurious to human health.

246.    Plaintiff did not discover, and did not know facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to PFAS; nor would a reasonable and diligent investigation by him have disclosed that AFFF used at the Bases would have contaminated Plaintiff's water supply at dangerous levels and caused his injury.

247.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment

248.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their

Case ID: 250200612

affirmative misrepresentations and omissions, Defendants actively concealed the true risks associated with use of and exposure to their products.

249.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

250.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of AFFF/Component Products. Defendants were under a duty to disclose the true character, quality and nature of AFFF/Component Products, including that they may cause adverse health impacts, contaminate public water supplies, particularly in the vicinity of military bases where it is heavily used, and accumulate in the body and environment over time, because this was non-public information over which they had exclusive control. Defendants knew this information was not available to Plaintiff, his medical providers and/or his health facilities, yet they failed to disclose this information to the public.

## Estoppel

251.    Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products accurate safety information concerning their products and the risks associated with the use of and/or exposure to PFAS.

252.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning PFAS and AFFF/Component Products and the serious risks associated with the use of and/or exposure to their products.

253.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

Case ID: 250200612

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Defective Product - Failure to Warn

254.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

255.    At all times relevant, Defendants were in the business of, among other things, designing, manufacturing, selling, or otherwise distributing AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

256.    As designers, manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the risks associated with the reasonably foreseeable uses of their products.

257.    As designers, manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF/Component Products.

258.    Defendants, as designers, manufacturers, sellers, and distributors of AFFF/Component Products placed into the stream of commerce, are guarantors of their AFFF/Component Products.

259.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF/Component Products were toxic and carcinogenic and could lead those exposed to these toxic chemicals and/or or their breakdown products to develop serious medical conditions.

260.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF/Component Products that they designed, manufactured, sold, and distributed

43

Case ID: 250200612

had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

261.    Defendants' AFFF/Component Products were unreasonably dangerous because they were far more dangerous than an ordinary consumer would expect when used, as designed, in their intended or reasonably foreseeable manner.

262.    These risks were not obvious to users of the AFFF/Component Products, nor were they obvious to residents in the vicinity of the AFFF/Component Product use, including Plaintiff, who was unwittingly exposed to Defendants' toxic and carcinogenic chemicals in his drinking water.

263.    Plaintiff could not have reasonably discovered the defects and risks associated with AFFF/Component Products.

264.    Plaintiff could not protect himself from exposure to Defendants' AFFF/Component Products that contain toxic and carcinogenic chemicals.

265.    The Defendants failed to provide warnings to the users that use of Defendants' AFFF/Component Products could result in the contamination of groundwater and, ultimately, drinking water supplies.

266.    The Defendants failed to provide warnings to the users of the dangers to human health and the environment if their AFFF/Component Products were permitted to contaminate the groundwater or drinking water supply.

267.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF/Component Products were inadequate.

Case ID: 250200612

268.    At all times relevant to this litigation, Defendants' AFFF/Component Products reached their intended consumers and users without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

269.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the AFFF/Component Products.

270.    Had Defendants provided adequate instructions and warnings, the contamination of the groundwater, surface water, and drinking water supply with toxic and carcinogenic chemicals would not have occurred.

271.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination from their AFFF/Component Products, the groundwater and drinking water on and around the Bases became contaminated with PFOS and PFOA.

272.    As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their AFFF/Component Products, the drinking water supplies on and around the Bases became contaminated with PFOS and PFOA and have caused personal injury to Plaintiff as described above.

273.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF/Component Products unreasonably dangerous and defective products.

274.    As a result of Defendants' design, manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

275.    As a direct and proximate result of Defendants placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of testicular cancer and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff has

Case ID: 250200612

developed testicular cancer; has been injured catastrophically; has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and loss of comfort; and has suffered economic damages, including a loss of income and expenses for medical care and treatment.

276.    Plaintiff will continue to suffer these damages and expenses in the future.

277.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas, such as Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00) including punitive damages as well as delay damages, pursuant to Pa.R.C.P. 238, interest and allowable costs of suit and brings this action to recover the same.

## SECOND CAUSE OF ACTION

### Defective Product - Design Defect (Consumer Expectations)

278.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

279.    At all times relevant, Defendants were in the business of, among other things, designing, manufacturing, selling, or otherwise distributing AFFF/Component Products.

Case ID: 250200612

280.    As manufacturers, designers, sellers, or distributors, Defendants had a duty to make and/or market AFFF/Component Products that were free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with them.

281.    Defendants breached that duty because the AFFF/Component Products that they manufactured, sold or distributed were dangerous to an extent beyond that contemplated by an ordinary consumer when used in their intended and reasonably foreseeable manner.

282.    Defendants, as designers, manufacturers, sellers, and distributors of AFFF/Component Products placed into the stream of commerce, are guarantors of their AFFF/Component Products.

283.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF/Component Products was toxic and carcinogenic and could lead those exposed to these toxic chemicals and/or their breakdown products to develop serious medical conditions.

284.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF/Component Products that they designed, manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

285.    Defendants' AFFF/Component Products were far more dangerous than an ordinary user and/or consumer would expect when used, as designed, in their intended or reasonably foreseeable manner.

286.    Defendants' AFFF/Component Products were, therefore, unreasonably dangerous.

287.    The risks of AFFF/Component Products were not obvious to users of the AFFF/Component Products, nor were they obvious to residents in the vicinity of the

Case ID: 250200612

AFFF/Component Product use, including Plaintiff, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals in their drinking water.

288.    Plaintiff could not have reasonably discovered the defects and risks associated with the use of AFFF/Component Products.

289.    Plaintiff could not protect himself from exposure to Defendants' toxic and carcinogenic chemicals.

290.    The Defendants' AFFF/Component Products were in a defective condition and unreasonably dangerous because they were dangerous to an extent beyond that contemplated by an ordinary user and/or consumer when used in its intended and reasonably foreseeable manner.

291.    Defendants' AFFF/Component Products were, therefore, defective.

292.    It was foreseeable that toxic chemicals from the AFFF/Component Products that Defendants manufactured, sold and distributed would enter the water supply of the Plaintiff and cause harm to his person.

293.    As a result of Defendants' design, manufacture, sale or distribution of a defectively designed product, Plaintiff's drinking water supply became contaminated with dangerous and toxic chemicals and caused damage to them.

294.    As a result of Defendants' design, manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

295.    As a direct and proximate result of Defendants' design, manufacture, sale or distribution of a defective product, the drinking water supplies in and around the Bases became contaminated with PFOS and PFOA and have caused personal injury to Plaintiff as described above.

Case ID: 250200612

296.    As a direct and proximate result of Defendants' placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of testicular cancer and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff has developed testicular cancer; has been injured catastrophically; and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and loss of comfort.

297.    Plaintiff will continue to suffer as a result of his condition in the future.

298.    Plaintiff has incurred and will continue to incur medical costs in the future.

299.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas, such as Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00) including punitive damages as well as delay damages, pursuant to Pa.R.C.P. 238, interest and allowable costs of suit and brings this action to recover the same.

### THIRD CAUSE OF ACTION

### Defective Product - Design Defect (Risk-Utility)

300.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

Case ID: 250200612

301.    At all times relevant, Defendants were in the business of, among other things, designing, manufacturing, selling, or otherwise distributing AFFF/Component Products.

302.    As designers, manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF/Component Products that were free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with them.

303.    Defendants' AFFF/Component Products were defectively designed and manufactured when it left the hands of Defendants, such that the foreseeable risks associated with the use, storage, and disposal of the AFFF/Component Products exceeded the alleged benefits associated with their design and formulation.

304.    At all relevant times, Defendants' AFFF/Component Products created significant risks to the environment and to human health, including Plaintiff's health, which far outweighed their utility.

305.    It was foreseeable that toxic chemicals from the AFFF/Component Products that Defendants designed, manufactured, sold and distributed would enter the water supply of the Plaintiff and cause harm to his person.

306.    As a result of Defendants' design, manufacture, sale or distribution of a defectively designed product, Plaintiff's drinking water supply became contaminated with dangerous and toxic chemicals and damaged the Plaintiff.

307.    Alternative designs of AFFF/Component Products were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiff.

308.    For example, all of the Defendants could have developed alternative formulations of AFFF/Component Products that do not contain long-chain Toxic Surfactants and/or that do not break down into long-chain Toxic Surfactants.

50

Case ID: 250200612

309. Upon information and belief, Defendants' current AFFF/Component Product formulations, which do not contain long-chain Toxic Surfactants, were technologically feasible during the relevant period.

310. A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF/Component Products.

311. The AFFF/Component Products designed, manufactured, sold, or distributed by the Defendants were defective in design because the foreseeable risk of harm posed by the AFFF/Component Products could have been reduced or eliminated by the adoption of a reasonable alternative design.

312. At all times relevant to this litigation, Defendants' AFFF/Component Products reached their intended consumers and users without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

313. As a direct and proximate result of Defendants placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of testicular cancer and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff has developed testicular cancer; has been injured catastrophically; has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and loss of comfort; and has suffered economic damages, including a loss of income and expenses for medical care and treatment.

314. Plaintiff will continue to suffer these damages and expenses in the future.

315. As a result of Defendants' manufacture, sale and distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

Case ID: 250200612

316.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in the surrounding areas, such as Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00) including punitive damages as well as delay damages, pursuant to Pa.R.C.P. 238, interest and allowable costs of suit and brings this action to recover the same.

## FOURTH CAUSE OF ACTION

### Negligence

317.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

318.    The Defendants had a duty to manufacture, market, and sell their AFFF/Component Products in a manner that avoided harm to those who foreseeably would come into contact with them.

319.    Defendants knew or should have known that the manufacture of AFFF/Component Products containing Toxic Surfactants and/or their chemicals precursors that break down into Toxic Surfactants was hazardous to human health and the environment.

320.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF/Component Products using Toxic Surfactants and/or their chemical precursors because it was a near certainty that the AFFF/Component

Case ID: 250200612

Products would migrate off of the Bases and contaminate the ground water and drinking water supply in the surrounding areas.

321.    Defendants knew or should have known that the PFOA and PFOS and/or their chemical precursors used in the manufacture of their AFFF/Component Products do not degrade, remain in the environment for decades, and bioaccumulate, thereby creating a potential health risk that could last for many years.

322.    The Plaintiff was a foreseeable victim of the harm caused by Defendants' AFFF/Component Products.

323.    As a result of Defendants' breach of their legal duties, the drinking water in and around the Bases, including Plaintiff's drinking water supply, became contaminated with unsafe levels of PFOS and PFOA.

324.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, Plaintiff's drinking water supply became contaminated with PFOS and PFOA.

325.    As a direct and proximate result of Defendants' negligence, Plaintiff has developed testicular cancer; has been injured catastrophically; has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and loss of comfort; and has suffered economic damages, including a loss of income and expenses for medical care and treatment.

326.    Plaintiff will continue to suffer these damages and expenses in the future.

327.    Defendants' manufacture, marketing, and sale of AFFF/Component Products, despite their knowledge of the risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in the surrounding areas, including Plaintiff, among other reasons,

Case ID: 250200612

demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

      WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Fifty Thousand Dollars ($50,000.00) including punitive damages as well as delay damages, pursuant to Pa.R.C.P. 238, interest and allowable costs of suit and brings this action to recover the same.

      Respectfully submitted,

      */s/ Nancy M. Christensen*
      Nancy M. Christensen, Esq.
      **WEITZ & LUXENBERG, P.C.**
      700 Broadway
      New York, NY  10003
      Phone: (212) 485-1897
      Fax: (212)344-5461
      nchristensen@weitzlux.com

      *Attorneys for Plaintiff*

Dated: February 4, 2025

54

## **VERIFICATION**

I, Rodney Hartman, hereby verify that I am the Plaintiff in the foregoing action and that the attached Complaint is based upon information which I have furnished to my counsel and information which has been gathered by my counsel in the preparation of the lawsuit. The language of the Complaint is that of counsel and not of affiant. I have read the Complaint and to the extent that the allegations therein are based upon information I have given counsel, they are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the Complaint are those of counsel, I have relied upon counsel in making this Verification. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

RODNEY HARTMAN